UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/8/08

---------------------------------------------------------X

LUISA C. ESPOSITO,

        Plaintiff,

  - against -

STATE OF NEW YORK, *et al.*,

        Defendants.

---------------------------------------------------------X

**OPINION
AND ORDER**

**07 Civ. 11612 (SAS)**

---------------------------------------------------------X

KEVIN MCKEOWN,

        Plaintiff,

  - against -

STATE OF NEW YORK, *et al.*,

        Defendants.

**08 Civ. 2391 (SAS)**

---------------------------------------------------------X

---------------------------------------------------------X

PAMELA CARVEL,

        Plaintiff,

  - against -

NEW YORK STATE, *et al.*,

        Defendants.

**08 Civ. 3305 (SAS)**

---------------------------------------------------------X

```
-----------------------------------------------------X
SUZANNE MCCORMICK,

                    Plaintiff,
                                                                    08 Civ. 4438 (SAS)
          - against -

STATE OF NEW YORK, *et al.*,

                    Defendants.
-----------------------------------------------------X
-----------------------------------------------------X
ELEANOR CAPOGROSSO,

                    Plaintiff,
                                                                    08 Civ. 5455 (SAS)
          - against -

THE NEW YORK STATE COMMISSION
ON JUDICIAL CONDUCT, *et al.*,

                    Defendants.
-----------------------------------------------------X
-----------------------------------------------------X
JOHN L. PETREC-TOLINO,

                    Plaintiff,
                                                                    08 Civ. 6368 (SAS)
          - against -

THE STATE OF NEW YORK, *et al.*,

                    Defendants.
-----------------------------------------------------X
```

SHIRA A. SCHEINDLIN, U.S.D.J.:

# I. INTRODUCTION

These actions, all filed as related to *Anderson v. State of New York*,[1] relate to alleged corruption in the New York State courts. Each action alleges some underlying wrongdoing by an attorney, followed by a complaint to the disciplinary committee, followed by the committee's failure to take action. The Complaints generally allege that the disciplinary committee is engaged in a conspiracy to "whitewash" grievances filed against prominent attorneys.

As discussed below, the United States Constitution does not permit this Court to supervise the departmental disciplinary committees or review the decisions of the courts of New York State. Regardless of the possibility of corruption in the courts of the State of New York, the only federal court that may review their decisions is the United States Supreme Court. Plaintiffs must direct their complaints to the state court system, the Attorney General for the State of New York, or the appropriate United States Attorney. Because the Court lacks jurisdiction to review the decisions of the departmental disciplinary committees, and for the other reasons stated below, these actions are dismissed.

---

[1]     07 Civ. 9599 (S.D.N.Y. filed Oct. 26, 2007).

## II. BACKGROUND

### A. *Esposito v. State of New York*

In this action, Luisa Esposito alleges that her former attorney repeatedly sexually harassed and assaulted her. She also alleges that the New York City Police Department failed to pursue her criminal complaint against him and that the New York state court system failed to pursue her attorney grievance.

### 1. Facts[2]

Esposito engaged the law firm of Pollack, Pollack, Isaac & DeCicco to represent her in a lawsuit resulting from a car accident. In May or June of 2005, that firm forwarded the relevant files to Gladstein & Isaac. On July 8, 2005, Esposito went to the offices of Gladstein & Isaac to meet with one of the attorneys for trial preparation.[3] During this meeting, without cause or provocation, that attorney grabbed Esposito's left breast. After the meeting, that attorney told Esposito that if she were to tell anyone what happened, he would no longer represent her.

The attorney then began a campaign of harassment. He repeatedly

---

[2] The facts in this section are taken from Esposito's Second Amended Complaint ("*Esposito* Compl.") and are assumed to be true for purposes of this motion.

[3] *See id.* ¶ 20.

4

telephoned Esposito, asked her to compile a list of sex acts that she could no longer perform as a result of the accident, demanded details of her personal life, and requested that she send him provocative photos.[4] Esposito recorded a number of these conversations. On another occasion, the attorney demanded that Esposito try on clothing in front of him, grabbed her breasts, and told her that he would not represent her unless she performed oral sex on him.[5] Faith Wyckoff witnessed a portion of this episode.

In October or November of 2005, Esposito contacted the New York County District Attorney and met with ADA Jennifer Steiner Crowell, who interviewed Esposito and had her sign medical releases. Crowell told Esposito she would pursue charges of extortion, coercion, and sexual abuse against the attorney.[6] However, Crowell stopped returning Esposito's calls.

On December 23, 2005, Esposito called the Rape Crisis Hotline and was sent to meet with Detective Arbuiso of the Manhattan Special Victims Unit. Arbuiso questioned Esposito and Wyckoff about the assault and then told them

---

[4]    *See id.* ¶ 21.

[5]    *See id.* ¶ 22.

[6]    *See id.* ¶ 23.

5

that he would arrest the attorney.[7] However, some time later, Arbuiso told Esposito that he "want[ed] to make the arrest" but because "favors" were called in, he was unable to do so.[8] He also explained that "it was ADA Lisa Friel that wasn't allowing the arrest."[9] She also met with Lieutenant Adam I. Lamboy, but he refused to accept her affidavit.[10]

In February of 2006, Esposito was called to meet with Crowell and Friel. She had brought an attorney, but the attorney was not permitted in the room.[11] Friel told her that the attorney's version of the story was more credible. The D.A.'s office closed the investigation.[12] Esposito also hired an attorney, Anthony Denaro, who sent a letter to Police Commissioner Raymond Kelly asking that the attorney be arrested.[13]

In October or November of 2005, Esposito filed a grievance with the

---

[7]    *See id.* ¶ 25.

[8]    *Id.* ¶ 26.

[9]    *Id.*

[10]    *See id.* ¶ 29.

[11]    *See id.* ¶ 27.

[12]    *See id.* ¶ 28.

[13]    *See id.* ¶ 30.

6

Appellate Division, First Department, Departmental Disciplinary Committee ("DDC") against the attorney. The grievance was handled by Naomi Goldstein, an attorney with the DDC. From 2006 through 2007, Goldstein conducted telephone interviews of Esposito. The DDC began hearings in April of 2007.[14] The Hon. Albert S. Blinder was the referee on the complaint. At the hearings, the DDC produced transcripts of Esposito's recordings that were inaccurate and refused to return the original tapes to Esposito.[15] It also refused to allow her attorney to attend the proceedings. On May 1, 2007, Esposito wrote numerous letters to various judges of the New York State Courts.[16] Esposito also complained to Thomas J. Cahill, Chief Counsel for the DDC.[17]

## 2. Claims

Pursuant to section 1983, Esposito claims that all defendants violated her rights to due process and equal protection, as well as her First Amendment right to petition the government for redress of grievances. She also claims that the City of New York, Kelly, Arbuiso, and Lamboy violated her rights to due process

---

[14]   *See id.* ¶ 34.

[15]   *See id.* ¶ 36.

[16]   *See id.* ¶ 37.

[17]   *See id.* ¶ 44.

7

and equal protection. Finally, she pleads state law breach of contract, breach of fiduciary duty, and assault claims against the attorney; Harvey Gladstein & Partners LLC; and Pollack, Pollack, Isaac & DeCicco LLP.

**B.** *McKeown v. State of New York*

This action also involves a claim that an attorney's conduct was unethical and that the New York State court system refused to investigate.

**1. Facts**[18]

On September 2, 2003, Kevin McKeown and his sister Mary Virga engaged the legal services of Joseph F. McQuade in connection with probate proceedings of their mother's estate.[19] At the time of her death, their mother had four living children, one of which, Ronald McKeown ("Ronald"), had been arrested for stealing over $100,000 from the Red Cross and had several large outstanding judgments for stolen money.[20] McKeown believed that his mother wanted her estate to repay the Red Cross, and informed McQuade of this fact, but his sister and McQuade took steps to prevent this.[21] McQuade then appeared in a

---

[18]    The facts in this section are taken from McKeown's Complaint ("*McKeown* Compl.") and are assumed to be true for purposes of this motion.

[19]    *See id.* ¶ 30.

[20]    *See id.* ¶ 32.

[21]    *See id.* ¶ 33.

8

conference in front of Joseph M. Accetta of the Office of Court Administration (the "OCA") in which he filed an order to show cause against McKeown.[22] McKeown alleges that Accetta and Robert M. DiBella, also an attorney at the OCA, and Judge Anthony A. Scarpino "failed their duty as an [sic] attorneys and as OCA employees when they chose not to report or take any action against McQuade's breaches of the most fundamental attorney-client obligations."[23]

Some time later, Ronald committed suicide. Shortly thereafter, Frank W. Streng, Ronald's attorney, filed an assignment of interest. Accetta; DiBella; Robert A. Korren, apparently an attorney involved in the case; McQuade; Michael McQuade ("M. McQuade"), partner of McQuade; and Judge Scarpino knew that Streng no longer had authority to file such a document, but "improperly remained silent and took no corrective action."[24] Charles and Christine Giulini, attorneys who were involved in the case, acted in reliance on the assignment knowing it to be improper.[25]

In early 2004, Charles Giulini told McKeown, "[i]f you don't simply

---

[22]    *See id.* ¶ 37. The Complaint does not make clear what the purpose of this order was.

[23]    *Id.* ¶ 41.

[24]    *Id.* ¶ 50.

[25]    *See id.* ¶ 58.

9

forget about the fucking assignment, and just stop bringing it up, you'll be fucking destroyed. You have no idea what the fuck you're up against."[26] Indeed, the Giulinis, Scarpino, McQuade, M. McQuade, Korren, DiBella, and Accetta "retaliated against plaintiff for raising the issue of the appearance of impropriety . . . ."[27]

On May 17, 2006, plaintiff filed an ethics complaint with the DDC against McQuade. On May 15, 2007, the DDC informed McKeown that the grievance had been resolved by the Surrogate and the DDC would take no further action.[28] Nancy J. Barry, Principal Attorney at the OCA, then sent a letter to the DDC that "was intended to improperly influence the DDC by conveying, displaying and expressing a heightened level of interest by defendants . . . in plaintiff's ethics complaint against defendant McQuade."[29]

In January of 2008, McKeown met with Sherry K. Cohen, a supervising attorney at the DDC, who stated that she was in charge of the

---

[26]     *Id.* ¶ 61. The Complaint actually reads, "If you don't simply forget about the fu$#ing assignment . . . ." While the Court appreciates plaintiff's efforts to spare the parties' sensibilities, such concerns do not outweigh the importance of accuracy and precision.

[27]     *Id.* ¶ 63.

[28]     *See id.* ¶ 67.

[29]     *Id.* ¶ 68.

10

grievance and that it had been resolved.[30]  McKeown contacted Cahill for more information, but Cahill was unable to tell him anything more.[31]

McKeown filed "numerous" grievances with the Second Department's Ninth Judicial District Grievance Committee.  He alleges that these were "summarily ignored," though he also alleges that as a result of the grievances, certain attorneys were admonished.[32]  The Grievance Committee also transferred one of the complaints to an attorney bar association, though Gary L. Casella and Catherine M. Miklitsch, attorneys employed by the committee, knew that this was improper.[33]  Further, Francis A. Nicolai, attorney and judicial administrator for the Ninth Judicial District, allegedly improperly protected Streng and refused to recuse himself.[34]

Judge Gail Prudenti of the Appellate Division, Second Department sent the allegations to the Commission on Judicial Conduct, which declined to

---

[30]  *See id.* ¶ 73.

[31]  *See id.* ¶ 74.

[32]  *Id.* ¶¶ 77-79.

[33]  *See id.* ¶ 81.

[34]  *See id.* ¶¶ 69, 71.

11

take action.[35] McKeown alleges that this Commission is "a partial arbiter of secreted agendas that provides a grossly improper disservice to plaintiff, the general public, the legal community, the system of law and, in fact, the vast majority of honorable justices of the state's courts."[36] He contends that the DDCs and the Commission "are improperly beholden to political and legal outsiders [and] advance or thwart selective ethics inquiries without regard to merit."[37]

### 2. Claims

McKeown alleges that all defendants violated his rights to petition the government for redress of grievances, to equal protection, and to due process pursuant to the First and Fourteenth Amendments. These claims are brought under section 1983. He also alleges state law breach of contract and breach of fiduciary duty claims against the McQuades and their law firm.

### C. *Carvel v. New York State*

In this action, Pamela Carvel, the daughter of ice cream magnate Tom Carvel, alleges that certain of Tom Carvel's employees conspired with the attorneys and judges that were involved in the administration of his estate. The

---

[35]  *See id.* ¶ 86.

[36]  *Id.* ¶ 90.

[37]  *Id.* ¶ 101.

result of this conspiracy was the theft of hundreds of millions of dollars from Tom

Carvel's rightful heirs and charitable institutions.[38]

### 1.   Facts[39]

Thomas Andreas Carvelas ("Tom Carvel"), founder of the Carvel

Corporation, was born in Athanassos, Greece in 1906. His family came to the

United States in 1910 and settled in New York City in 1920.[40] Advised to leave

the City to treat his tuberculosis, he borrowed money from his future wife, Agnes,

built a frozen custard trailer, and set out to Westchester County, New York. A flat

tire led to the selection of a permanent location, and by 1939 his business had

---

[38]      Issues relating to the estate of Tom Carvel have been heavily litigated
in this and other courts. *See, e.g., Estate of Carvel ex rel. Carvel v. Ross,* No. Civ.
A. 07-238, — F. Supp. 2d —, 2008 WL 2794806 (D. Del. July 17, 2008); *In re
Carvel,* 853 N.Y.S.2d 902 (2d Dep't 2008); *Carvel v. Carvel Found. Inc.,* 230 Fed.
App'x 103 (2d Cir. 2007), *cert. denied,* — U.S. —, 128 S. Ct. 1658 (2008); *Carvel
v. Godley,* 939 So. 2d 204 (Fla. App. 4th Dist. 2006); *In re Carvel,* 808 N.Y.S.2d
100 (2d Dep't 2005); *In re Carvel,* 755 N.Y.S.2d 851 (2d Dep't 2003), *leave to
appeal denied,* 3 N.Y.3d 604 (2004); *In re Carvel,* 769 N.Y.S.2d 402 (2d Dep't
2003); *Carvel v. Godley,* 41 F. Supp. 2d 476 (S.D.N.Y. 1999); *In re Thomas &
Agnes Carvel Found.,* 36 F. Supp. 2d 144 (S.D.N.Y.), *app. dismissed,* 188 F.3d 83,
(2d Cir. 1999); *Carvel v. Arcadipane,* 661 N.Y.S.2d 982 (2d Dep't 1997).

[39]      Except where indicated, the facts in this section are taken from the
Amended Complaint ("*Carvel* Compl.") and are assumed to be true for purposes of
this motion.

[40]      *See* Jeffrey B. Gale, The Smithsonian Institute, *Carvel Ice Cream
Records, 1934-1989* (1993), *available at*
http://americanhistory.si.edu/archives/d7488.htm.

become well-established. With Agnes's assistance, Tom Carvel ran the business for decades, building it into a national franchise and household name. In 1989, one year before his death, he sold the business to Investcorp.[41]

On Saturday, October 20, 1990, Tom revealed that he was firing his secretary, Mildred Arcadipane, and his lawyer, Robert Davis, and that he and his niece, plaintiff Pamela Carvel, were to commence an investigation into collusion between his employees and attorneys employed by Investcorp.[42] The next day, Tom was found dead.[43] William Griffin, an attorney and Chairman of Hudson Valley Bank, was colluding with Arcadipane and Davis to take control of the Carvel estate.[44] Most of the estate's records were transferred to Hudson Valley Bank, where they were altered, forged, or destroyed.[45] On August 4, 1998, Agnes Carvel died from a stroke.[46]

Pamela Carvel hired Blank Rome to represent the estate, which was

---

[41]   *See id.*

[42]   *See Carvel* Compl. ¶ 49.

[43]   *See id.*

[44]   *See id.* ¶ 50.

[45]   *See id.* ¶ 52.

[46]   *See id.* ¶ 62.

14

assigned to the Hon. Anthony Scarpino. Blank Rome attorney Eve Markewich

entered into a secret agreement with Griffin's attorneys pursuant to which

Markewich would receive between three and four million in legal fees as long as

she prevented Pamela Carvel and Agnes Carvel's estate from obtaining any money

from Tom Carvel's estate.[47]  A number of individuals knew of this behavior and

failed to report it.[48]  Markewich and Leonard Ross, apparently an associate of

Markewich, also colluded to steal securities that belonged to Pamela Carvel.[49]

Pamela Carvel then hired Streng, McCarthy, and Aurnou, attorneys

from the law firm of McCarthy Fingar.  Streng failed to disclose that he was

employed by the court system as "Scarpino's advisor in a 'transition committee'

from Supreme Court to Surrogate's Court."[50]  These attorneys "did nothing to

oppose Markewich's breach of promise to seek timely reimbursement to Pamela

that was the condition of Blank Rome's employment."[51]  Instead, they aided

---

[47]     *See id.* ¶ 64.

[48]     *See id.* ¶ 66.

[49]     *See id.* ¶ 117.

[50]     *Id.* ¶ 72.

[51]     *Id.* ¶ 125.

15

Griffin, Judge Scarpino, and Charles Scott, an attorney employed by OCA.[52] Aurnou had apparently been retained separately and later joined McCarthy Fingar.[53]

Unbeknownst to Pamela Carvel, Scarpino had received several hundred thousand dollars in loans from Hudson Valley Bank, which was controlled by Griffin.[54] Days before a response was due opposing certain fee applications, Streng withdrew as counsel and refused to return a cash advance.[55]

Pamela Carvel also contends that Griffin wrongfully sold Agnes Carvel's former residence to the brother of attorney Paul Amicucci, a member of Griffin's law firm and member of the Hudson Valley Bank Business Development Board. She alleges that the purchase price was a small fraction of its fair market value.[56]

Pamela Carvel also alleges that Markewich colluded with Griffin, Streng, McCarthy, Aurnou, Scarpino, and Scott to prevent Certified Public

---

[52]  *See id.* ¶ 126.

[53]  *See id.* ¶ 129.

[54]  *See id.* ¶ 70.

[55]  *See id.* ¶ 75.

[56]  *See id.* ¶ 84.

Accountant Anthony Vasile from receiving payment for services he performed for the estate.[57] Vasile was hired to investigate improper money transfers in the years following Tom Carvel's death.[58]

On August 30, 2005, Pamela Carvel filed a complaint with the DDC against Markewich and filed a separate complaint with the grievance committee against Streng.[59] Both complaints were dismissed on the ground that they were the subjects of litigation.[60] By letter to Cahill, on July 19, 2006, Pamela Carvel requested that the DDC reconsider its decision. She believes her complaint was dismissed by Cohen and Cahill "because of Markewich and Blank Rome's influential connections."[61]

The New York State Attorney General's Office also became involved in the conspiracy. Assistant Attorney General Laura Werner entered into agreements with Griffin and the other conspirators. As a result, Werner took

---

[57]     *See id.* ¶ 89.

[58]     *See id.* ¶ 95.

[59]     *See id.* ¶ 101.

[60]     *See id.* ¶ 105.

[61]     *Id.* ¶ 108.

positions during the estate litigation that opposed those of Pamela Carvel.[62]

Pamela Carvel also alleges that Werner failed to maintain proper records of the

various charities controlled by Thomas and Agnes Carvel.[63] Deborah McCarthy, a

former attorney at McCarthy Fingar who joined the Attorney General's Charities

Bureau, was also involved in the conspiracy.[64] McCarthy falsified documents to

assist McCarthy Fingar in billing over $700,000 in legal services to the estate.[65]

### 2. Claims

Pursuant to section 1983, Pamela Carvel alleges that all defendants

engaged in a conspiracy to deny her rights to due process and equal protection.

She further alleges that all defendants violated her rights to free speech and to

petition the government for redress of grievances. Her remaining claims are state

law claims.

---

[62]     *See id.* ¶ 136.

[63]     *See id.* ¶ 141.

[64]     *See id.* ¶ 145.

[65]     *See id.* ¶ 150.

## D. *McCormick v. State of New York*

### 1. Facts[66]

Unlike the other plaintiffs, Suzanne McCormick has provided

minimal information as to her underlying dispute. She hired Winthrop Rutherford,

Jr. and David G. Keyko to represent her in connection with the estate of her late

husband.[67] Rutherford and Keyko altered court records and committed other acts

of misconduct, culminating in a multi-million dollar fraud.[68]

In 2005, McCormick filed a complaint with the DDC and provided

"confirming evidence" of the fraud perpetrated by Rutherford and Keyko.[69]

Despite knowledge of Rutherford's and Keyko's fraudulent activity, the DDC

"completely failed their individual and collective ethical duties as attorneys at law

when they chose not to report or take any action concerning the [fraud]."[70]

---

[66]    The facts in this section are taken from McCormick's Complaint
("*McCormick* Compl.") and are assumed to be true for purposes of this motion.

[67]    *See id.* ¶¶ 11, 13.

[68]    *See id.* ¶ 12.

[69]    *See id*. ¶¶ 12, 15-16.

[70]    *Id.* ¶ 18.

19

## 2. Claims

Pursuant to section 1983, McCormick claims that all defendants violated her rights to due process and equal protection, as well as her right to petition the government for redress of grievances. She also alleges state law breach of contract against all defendants and that "every defendant [breached] her basic constitutionally guaranteed right of fiduciary duties of good faith, loyalty, and care."[71]

## E. *Capogrosso v. New York State Commission on Judicial Conduct*

Plaintiff Eleanor Capogrosso, an attorney admitted to practice in New York, has brought an action that comprises what appear to be a series of unrelated disputes. These are described separately.[72]

### 1. The Default Judgment

Capogrosso hired Gentile & Benjamin to defend her in a fee dispute action brought by attorney Gregory Calabro.[73] A default was awarded against her. She asked attorney Howard Benjamin to move to vacate the default, but he

---

[71]     *Id.* ¶ 38.

[72]     The facts in this section are taken from Capogrosso's Amended Complaint ("*Capogrosso* Compl.") and are assumed to be true for purposes of this motion.

[73]     *Id.* ¶¶ 31-32.

refused, promising instead to pay the judgment. He failed to provide her with evidence that he did so.[74] As a result, the default remained on her credit record, causing her various financial problems.

In 2001, Capogrosso filed a grievance with the First Department DDC against Calabro and Benjamin for failing to maintain bank records for the requisite period of time. Sarah Jo Hamilton, First Deputy Chief Counsel for the DDC, had the action moved to the Fourth Department DDC, which closed the action.[75]

Capogrosso then sued Calabro under the Fair Credit Reporting Act. The action was assigned to defendant the Hon. Joan M. Kenney. Capogrosso also filed a new grievance against Benjamin. Cahill referred the grievance to mediation. Capogrosso filed an action for judicial review of the DDC's dismissal of her grievance with the Appellate Division, but that court declined to exercise jurisdiction.[76] Judge Kenney dismissed the action, and based on that decision the DDC canceled the mediation.[77] Capogrosso alleges that Judge Kenney's decision

[74]    *See id.* ¶¶ 34-36.

[75]    *See id.* ¶¶ 37-39.

[76]    *See id.* ¶ 46.

[77]    *See id.* ¶ 47.

contains false statements.[78]

Capogrosso's office was located near the World Trade Center, and the events of September 11, 2001 disrupted her ability to work. Following those events, then-Governor Pataki issued a series of executive orders that permitted courts to extend any time limits fixed by statute for directly affected persons. Capogrosso "had left the country since her office was not functioning."[79]

In what was apparently a separate action filed by Capogrosso against Benjamin, assigned to the Hon. Carol R. Edmead, Benjamin moved to dismiss, and Edmead refused to grant Capogrosso an adjournment even though she was not in the country. Instead, he granted Benjamin's motion to dismiss by default.[80] Capogrosso moved to vacate the default, and her motion was assigned to the Hon. Jeffrey K. Oing, who upheld the default.[81] She filed a motion to reargue this decision, and it was denied by the Hon. Geoffrey D. Wright.[82] Capogrosso then filed an order to show cause regarding Judge Wright's decision with the Hon.

---

[78]    *See id.* ¶¶ 75-76.

[79]    *Id.* ¶ 92. Capogrosso does not explain why it was necessary for her to leave the country.

[80]    *See id.* ¶ 94.

[81]    *See id.* ¶¶ 96-99.

[82]    *See id.* ¶ 102.

Martin A. Shulman, who did not take appropriate action.[83]  Capogrosso then

notified the Hon. Fern Fisher Brandveen and the Hon. Joan B. Carey, who also

failed to take appropriate action.[84]  Capogrosso notified Carrie Cohen, Chief of the

Public Integrity Unit of the Office of the Attorney General, and copied Sherill

Spatz, Inspector General, but they took no action.[85]

        Capogrosso sent more supporting documentation to the DDC.  The

DDC attempted to resolve the issue by obtaining bank copies of the checks used

by Benjamin to pay the judgment, to assist in removing the debt from her credit

report.  She did not obtain these checks.  Capogrosso sent a number of letters to

Chief Judge Judith Kaye concerning the DDC's refusal to pursue the grievance

and other matters, but these letters were ignored.

        On November 8, 2004, Cahill informed Capgrosso that the DDC had

completed the investigation and would take no action against Benjamin.[86]  She

appealed to Paul Curran, Chairman of the DDC, but he denied reconsideration.

She then wrote letters to Chief Judge Kaye and to Judge John Buckley, but these

---

[83]    *See id.* ¶ 106.

[84]    *See id.* ¶¶ 109, 112.

[85]    *See id.* ¶ 114.

[86]    *See id.* ¶ 67

went unanswered.

## 2. Failure to Adjourn a Conference

On October 10, 2001, Capogrosso appeared before defendant the
Hon. Eileen Rakower in connection with an action she had filed against the
Hospital for Special Surgery. She had been awarded a default, but the hospital had
moved to open the default and be permitted to file an answer. Capogrosso
requested an adjournment to oppose the motion because of the state of her office.[87]
Judge Rakower denied the adjournment request and granted the motion.[88]

## 3. Legal Malpractice

Capogrosso sued a former attorney for malpractice.[89] Defendant the
Hon. Debra James dismissed this action.[90]

## 4. Alleged Animus

Capogrosso alleges that defendant the Hon. Judith Gische presided
over a case that Capogrosso filed and that she "screamed at counsel, 'Do you
know how many frivolous cases she has? Don't you know that she is a

---

[87]  *See id.* ¶ 79.

[88]  *See id.* ¶ 90.

[89]  *See id.* ¶ 121.

[90]  *See id.* ¶ 123.

24

professional litigant?'"[91]  As a result of Judge Gische's animus, Capogrosso had to settle the case rather than go to trial, allegedly depriving Capogrosso of her right to due process.[92]

### 5.    Denial of Counsel

In an apparently unrelated action also brought by Capogrosso, the defendant Hon. Eileen Bransten granted a motion for Capogrosso's counsel to withdraw, apparently on the ground that Judge Bransten and the attorney were friends.[93]  Judge Bransten then ordered Capogrosso to appear for a deposition without counsel; when Capogrosso refused, Judge Bransten caused Capogrosso to bear the $108 court reporter fee and then dismissed Capogrosso's complaint.[94]

### 6.    Claims

Pursuant to section 1983, Capogrosso alleges that Hamilton, Cohen, Cahill, Curran, Chief Judge Kaye, and Judge Buckley engaged in a conspiracy to violate her due process rights.  She also alleges that they engaged in obstruction of

---

[91]    *Id.* ¶ 78.

[92]    *See id.* ¶ 129.

[93]    *See id.* ¶ 130 ("Defendant Bransten improperly granted a motion for plaintiff's counsel to withdraw that plaintiff was a party [sic] on the basis of her longstanding friendship with the attorney of record.").

[94]    *See id.* ¶¶ 132-133.

justice, conspiracy to obstruct justice, and deprivation of property. She asserts that the DDC, Cahill, Judge Buckley, Curran, Chief Judge Kaye, the State of New York, and the OCA are liable for negligent supervision. Pursuant to section 1983, she alleges that Chief Judge Kaye; Spatz; the OCA; the State Commission on Judicial Conduct (the "SCJC"), the State of New York; Raoul Felder, Chair of the SCJC; Carey; and Judges Brandveen, Bransten, Gische, Shulman, Wright, Oing, Rakower, and Edmead engaged in a conspiracy "to hinder public and legal justice in the State of New York . . . all in retaliation because plaintiff filed complaints and letters about the defendants repeated contempt of Executive orders and Directives."[95] She further alleges that Judge Kenney made false public statements, specifically, that a certain lawsuit "appears to be the 35th lawsuit plaintiff has brought in this court, on her own behalf, as a pro se litigant, since 1998."[96] She also alleges that Judge James made false public statements and deprived her of property and that Judges Bransten and Gische deprived her of her due process rights by failing to adjudicate her state court actions fairly. Capogrosso next alleges that Chief Judge Kaye; Judges Rakower, Edmead, Oing, Wright, Bransten, Gische, Kenney, James, and Shulman; the SCJC; and the State of New York

---

[95]     *Id.* ¶ 167.

[96]     *Id.* ¶ 175.

26

engaged in a separate conspiracy to obstruct justice and that Spatz; the OCA; the State of New York; Judges Shulman, Brandveen, and Carey; and Chief Judge Kaye are responsible for negligent supervision. She further pleads a separate negligent supervision claim against Felder and the SCJC.

Capogrosso's final cause of action concerns section 44 of the New York Judiciary Law. Section 44 provides in relevant part that the SCJC, upon receiving a complaint as to the conduct of a judge, may dismiss the complaint "if it determines that the complaint on its face lacks merit."[97] Capogrosso asserts that by permitting an organization "that is not subject to review or oversight" to review these complaints, the law denies (presumably the complainants) due process and equal protection.

## F.    *Petrec-Tolino v. State of New York*

John Petrec-Tolino also asserts that the DDC failed to address a grievance. His Complaint provides little information about the underlying dispute.

### A.    Facts[98]

Petrec-Tolino's spouse, Sherri Petrec-Tolino, has a history of mental

---

[97]    N.Y. Jud. L. § 44.

[98]    The facts in this section are taken from Petrec-Tolino's Amended Complaint ("*Petrec-Tolino* Compl.") and are assumed to be true for purposes of this motion.

illness.[99]  During their engagement, they hired attorney Jeffrey S. Eisenberg to draft a document granting Petrec-Tolino power of attorney.  Apparently the relationship soured; in 2004, Petrec-Tolino filed a grievance against Eisenberg with the DDC.[100]

On September 11, 2006, Petrec-Tolino filed an action in small claims court against Eisenberg for breach of contract.  Eisenberg responded with a motion to dismiss that included a fraudulent contract and falsely alleged that Petrec-Tolino made threats to his safety.[101]  Judge Cindy Kern ruled against Petrec-Tolino on his claims and denied Eisenberg's counterclaims.  "Plaintiff failed to file a timely 'Notice of Appeal' due to mercury and arsenic poisoning."[102]

Petrec-Tolino then filed a grievance with the DDC regarding the fraudulent contract.  On December 1, 2006, Cahill closed the file, marking it as a fee dispute.[103]  Petrec-Tolino also notified the United States Postal Inspector, who forwarded the complaint to the Attorney General for the State of New York.

---

[99]     *See id.* ¶ 3.

[100]    *See id.* ¶ 17.

[101]    *See id.* ¶ 18.

[102]    *Id.* ¶ 20.

[103]    *See id.* ¶ 21.

Petrec-Tolino also complained to Attorney General Eliot Spitzer.

On June 1, 2007, the DDC agreed to reconsider Petrec-Tolino's grievance. Eisenberg sent a defamatory and fraudulent response.[104] On December 28, 2007, Cohen closed the file.[105] Petrec-Tolino requested further reconsideration, but Alan W. Friedberg, also a DDC administrator, denied this request.[106]

**B.    Claims**

Petrec-Tolino alleges that the DDC, Cahill, Cohen, Friedberg, and Rebecca Taub, an administrator at the DDC,[107] are liable pursuant to section 1983 for denying his rights to due process and equal protection, as well as his right to petition the government for redress of grievances. He also alleges that all defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") in that they "all acted in concert to conspire and roadblock Plaintiff's

---

[104]    *See id.* ¶ 26.

[105]    *See id.* ¶ 29.

[106]    *See id.* ¶ 31.

[107]    *See id.* ¶ 32 ("By misrepresenting Plaintiff, Cahill, Cohen and Friedberg are in violation of DR 1-102, as is Rebecca Taub who intakes all complaints, etc.").

due process and equal protection under the law."[108]  Petrec-Tolino also alleges that Eisenberg is liable for witness tampering, "making an apparently false statement in the first degree,"[109] defamation, breach of fiduciary duties, and other state law violations.

## III.  APPLICABLE LAW

### A.  Standard of Review

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[110] When deciding a defendant's motion to dismiss under Rule 12(b)(6), courts must "accept as true all of the factual allegations contained in the complaint"[111] and "draw all reasonable inferences in plaintiff's favor."[112]  Likewise, when deciding a motion for judgment on the pleadings, a court "must accept all allegations in the

---

[108]     *Id.* ¶ 12.

[109]     *Id.* ¶ 13.

[110]     *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[111]     *Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007).

[112]     *Ofori-Tenkorang v. American Int'l Group*, 460 F.3d 296, 298 (2d Cir. 2006).

complaint as true and draw all inferences in the non-moving party's favor."[113]

Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[114] Although the complaint need not provide "detailed factual allegations,"[115] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[116] The test is no longer whether there is "'no set of facts [that plaintiff could prove] which would entitle him to relief.'"[117] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to

---

[113]   *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (citing *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998)).

[114]   *Bell Atl.*, 127 S. Ct. at 1970.

[115]   *Id*. at 1964. *See also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (applying the standard of plausibility outside *Bell Atlantic*'s anti-trust context) .

[116]   *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after the events of September 11, 2001).

[117]   *Bell Atl.*, 127 S. Ct. at 1968 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

raise a right to relief above the speculative level.'"[118]

Although this Court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law . . . if the claim is not legally feasible."[119] In addition, "bald assertions and conclusions of law will not suffice."[120]

Courts must construe pro se complaints liberally.[121] However, a litigant's pro se status does not exempt him from compliance with the relevant rules of procedural and substantive law.[122]

## B.   Rule 8(a)

"[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial."[123] "The statement should be short because

---

[118]    *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Bell Atl.*, 127 S. Ct. at 1965).

[119]    *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

[120]    *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atl. Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (quotation omitted).

[121]    *See Lerman v. Board of Elections in the City of N.Y.*, 232 F.3d 135, 140 (2d Cir. 2000). *See also Haines v. Kerner*, 404 U.S. 519, 596 (1972) (providing that courts should hold "allegations of [] pro se complaint[s] . . . to less stringent standards than formal pleadings drafted by lawyers.").

[122]    *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

[123]    *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

'[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'"[124]

If a pleading fails to comply with Rule 8(a), the court may strike redundant or immaterial portions or, if "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," dismiss the complaint entirely.[125] It is generally an abuse of discretion to deny leave to amend when a complaint is dismissed for this reason.[126]

## C. Section 1983

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[127] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law,

---

[124]    *Id.* (quoting C. Wright & A. Miller, 5 *Federal Practice and Procedure* § 1281 (1969)).

[125]    *Id.*

[126]    *See id.* (citing *Gordon v. Green*, 602 F.2d 743, 745-47 (5th Cir. 1979), in which the court ruled that plaintiffs should have been given leave to amend a 4000-page complaint) (other citations omitted).

[127]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

33

and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[128]

## D.    Racketeer Influenced and Corrupt Organizations ("RICO")

A plaintiff claiming a civil RICO violation must allege each of the claim's elements, including "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity."[129] In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants.[130] Civil RICO should not be used to transform a "garden variety fraud or breach of contract case[] . . . into a vehicle for treble damages."[131] The statute of limitations

---

[128]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

[129]    *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

[130]    *See Kirk v. Heppt*, No. 05 Civ. 9977, 2006 WL 689510, at *2 (S.D.N.Y. Mar. 20, 2006) ("Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.") (citations and quotation marks omitted).

[131]    *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000). *Accord Kirk*, 2006 WL 689510, at *2 (observing that courts "must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing"); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (noting that because civil RICO "is an unusually potent weapon – the litigation equivalent of a thermonuclear device . . . courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb").

for civil RICO claims is four years.[132]

## E. The Right to an Investigation

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."[133] "[C]ourts within the Second Circuit have determined that '[t]here is ... no constitutional right to an investigation by government officials.'"[134] Thus, there is no constitutional violation where the government refuses to investigate a crime, allegations of patent fraud, or an attorney ethics grievance.[135]

## F. Immunity

### 1. The Eleventh Amendment

The Eleventh Amendment to the United States Constitution provides

---

[132]     *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987).

[133]     *DeShaney v. Winnebago Soc. Servs.*, 489 U.S. 189, 196 (1989).

[134]     *Nieves v. Gonzalez*, No. 05 Civ. 17, 2006 WL 758615, at *4 (W.D.N.Y. Mar. 2, 2006) (quoting *Bal v. City of New York*, No. 94 Civ. 4450, 1995 WL 46700, at *2 (S.D.N.Y. Feb. 7), *aff'd*, 99 F.3d 402 (2d Cir. 1995)) (alterations in *Nieves*).

[135]     *See Longi v. County of Suffolk*, No. CV-02-5821, 2008 WL 858997, at *6 (E.D.N.Y. Mar. 27, 2008) ("[T]here is no constitutional right to an investigation by government officials.").

that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Because the States have sovereign immunity against claims in federal court, a private citizen cannot sue a State unless the State has consented or Congress has abrogated that immunity.[136] "This jurisdictional bar also immunizes a state entity that is an 'arm of the State,' including, in appropriate circumstances, a state official acting in his or her official capacity."[137]

However, under the rule of *Ex parte Young*,[138] "'a plaintiff may sue a state official acting in his official capacity – notwithstanding the Eleventh Amendment – for prospective, injunctive relief from violations of federal law.'"[139]

---

[136]    *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Although the text of the Amendment suggests that it does not prohibit a citizen from suing his own state in federal court, the Supreme Court has explained that the Amendment clarifies that the States enjoy broad sovereign immunity, including immunity in federal court from suits brought by their citizens. *See Hans v. Louisiana*, 134 U.S. 1 (1890).

[137]    *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (citing *Northern Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189 (2006); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).

[138]    209 U.S. 123 (1908).

[139]    *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (quoting *In re Deposit Ins. Agency*, 482 F.3d at 617).

This relief requires that there be an ongoing violation of federal law.[140]

           "Although the Supreme Court has not specifically ruled on this burden question, circuit courts that have done so have unanimously concluded that 'the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity.'"[141] To determine whether a state agency is entitled to immunity under the Eleventh Amendment, the Second Circuit has prescribed six factors: "'(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.'"[142] If these are not dispositive, "a court focuses on the twin reasons for the Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state treasury."[143] "If the outcome

---

[140]    *See id.* at 96 ("We are specifically required by *Ex parte Young* to examine whether there exists an ongoing violation of federal law.") (citing *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

[141]    *Woods v. Rondout Valley Central School Dist. Bd of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (quoting *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002) (citations omitted)).

[142]    *Id.* at 240 (quoting *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996)).

[143]    *Id.* (citing *Mancuso*, 86 F.3d at 293).

37

still remains in doubt, then whether a judgment against the governmental entity would be paid out of the state treasury generally determines the application of Eleventh Amendment immunity."[144]

## 2. Judicial Immunity

Judges have absolute immunity from suits for acts performed in their judicial capacities. Even if a judge acts maliciously, a litigant's remedy is to appeal, not to sue the judge. Judicial immunity can be overcome only where a judge completely lacks jurisdiction over the subject matter. This immunity also extends to the institution of the court itself, as well as its supporting offices.

It is "well-established that officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages."[145] "Absolute immunity extends not only to judges and prosecutors, but also to officials who perform functions closely associated with the judicial process, including parole board officials conducting parole hearings, federal hearing examiners, administrative law judges,

---

[144]    *Id.* at 241.

[145]    *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999).

and law clerks."[146]

Judicial immunity was created "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences."[147] "Thus, if the relevant action is judicial in nature, the judge is immune so long as it was not taken in the complete absence of jurisdiction."[148] Quasi-judicial immunity protects administrative officers who act in a judicial manner.[149] Attorney disciplinary proceedings are "judicial in nature,"[150] so the presiding officers are protected by absolute immunity. However, neither judicial immunity nor quasi-judicial

---

[146]    *Roe v. Johnson*, 334 F. Supp. 2d 415, 423 (S.D.N.Y. 2004) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) (hearing examiners and administrative law judges); *Montero*, 171 F.3d at 760 (parole board officials); *Oliva v. Heller*, 839 F.2d 37, 40 (2d Cir. 1988) (law clerks)).

[147]    *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

[148]    *Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005). *Accord Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'").

[149]    *See Sassower v. Mangano*, 927 F. Supp. 113, 120 (S.D.N.Y. 1996) ("Under the doctrine of quasi-judicial immunity, absolute immunity extends to administrative officials performing discretionary acts of a judicial nature.").

[150]    *Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 433-34 (1982) ("It is clear beyond doubt that the New Jersey Supreme Court considers its bar disciplinary proceedings as 'judicial' in nature.").

immunity bars a claim for prospective injunctive relief.[151]

## 3. Qualified Immunity

The doctrine of qualified immunity protects government officials
from civil liability if the officials' conduct "'does not violate clearly established
statutory or constitutional rights of which a reasonable person would have
known.'"[152] Qualified immunity balances "'the need . . . to hold responsible public
officials exercising their power in a wholly unjustified manner and . . . [the need]
to shield officials responsibly attempting to perform their public duties in good
faith from having to explain their actions to the satisfaction of a jury.'"[153]
Qualified immunity "provides ample protection to all but the plainly incompetent
or those who knowingly violate the law."[154] Qualified immunity is "a defense
afforded only to individuals – not municipalities or municipal agencies."[155] "[A]n

[151]   *See Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) ("We conclude
that judicial immunity is not a bar to prospective injunctive relief against a judicial
officer acting in her judicial capacity.").

[152]   *Velez v. Levy*, 401 F.3d 75, 100 (2d Cir. 2005) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)).

[153]   *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001) (quoting
*Kaminsky v. Rosenblum*, 929 F.2d 922, 924-25 (2d Cir. 1991)).

[154]   *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[155]   *Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 153 n.2
(S.D.N.Y. 2006).

official sued in his official capacity may not take advantage of a qualified
immunity defense."[156]

　　　　　There are three steps in a qualified immunity analysis. The court first
must determine whether, "taken in the light most favorable to the party asserting
the injury . . . the officer's conduct violated a constitutional right . . . ."[157] If there
is no constitutional violation, the defendant is not liable and the court need not
proceed further. If, however, the plaintiff proves a constitutional violation, the
court moves to the second step, which asks whether or not, at the time of the
violation, the law prohibiting the defendant's conduct was clearly established.[158]
If the violated right was not clearly established, the officer is immunized from
liability. "Clearly established" means: "(1) the law is defined with reasonable
clarity, (2) the Supreme Court or Second Circuit has recognized the right, and (3)
'a reasonable defendant [would] have understood from the existing law that [his]
conduct was unlawful.'"[159] If the law prohibiting defendant's conduct was clearly

---

[156] *Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985) (Brennan, J.,
concurring in part and dissenting in part) (citing *Brandon v. Holt*, 469 U.S. 464,
472-73 (1985)).

[157] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[158] *See id.*

[159] *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young
v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)) (alterations in *Anderson*).

established, the court moves to the final step in the analysis, which asks whether

or not "'it was objectively reasonable for [the defendant] to believe that his actions

were lawful at the time of the challenged act.'"[160] An official's conduct is

objectively unreasonable, and not eligible for qualified immunity, "when no

officer of reasonable competence could have made the same choice in similar

circumstances."[161]

## G.    The *Rooker-Feldman* Doctrine

In *Rooker v. Fidelity Trust Co.*, the Supreme Court held that federal

district courts "lacked the requisite appellate authority, for their jurisdiction was

'strictly original.'  Among federal courts, the *Rooker* Court clarified, Congress had

empowered only [the Supreme Court] to exercise appellate authority 'to reverse or

modify' a state-court judgment."[162] In *District of Columbia Court of Appeals v.

Feldman*, the Court further clarified that state court proceedings that were "judicial

in nature" were reviewable only by the Supreme Court or by the highest court of

---

[160]    *Anthony v. City of N.Y.*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)).

[161]    *Id.* at 138 (quotation marks omitted).

[162]    *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (internal citations omitted).  *Accord Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

the state.[163] A denial of bar admission to two men who had not graduated from ABA accredited law schools by the Court of Appeals for the District of Columbia was considered a proceeding that was "judicial in nature" by the *Feldman* Court, and therefore not reviewable by the district court.[164]

## IV. DISCUSSION

### A. Immunity

#### 1. The Eleventh Amendment

The State of New York has not consented to be sued in these actions and Congress has not abrogated state immunity for plaintiffs' claims. Therefore, this Court has no jurisdiction to hear any claims against the State. Similarly, the Appellate Divisions of the New York State Supreme Court are an arm of the State of New York.[165] All claims against these defendants are therefore dismissed.

The New York State Legislature has vested the exclusive jurisdiction

---

[163] *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983). *Accord Exxon Mobil*, 544 U.S. at 285.

[164] *Feldman*, 460 U.S. at 479-82.

[165] *See* N.Y. Const. art. 6, § 1. Further, neither the State nor the Appellate Division can be sued under section 1983 because they are not "persons." *See Zuckerman v. Appellate Div., Second Dep't, Supreme Court of State of N.Y.*, 421 F.2d 625, 626 (2d Cir. 1970) ("[I]t is quite clear that the Appellate Division is not a 'person' within the meaning of 42 U.S.C. § 1983. . . . [T]he state itself is also not subject to suit under section 1983.") (citation omitted).

43

to discipline attorneys in the four departments of the Appellate Division of the Supreme Court.[166] The Departments have delegated to the Departmental Disciplinary Committees their judicial function of investigating charges of attorney misconduct.[167] Accordingly, each Committee, like the disciplinary and

---

[166]     The Judiciary Law of the State of New York states:

> The supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is authorized to censure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; and the appellate division of the supreme court is hereby authorized to revoke such admission for any misrepresentation or suppression of any information in connection with the application for admission to practice.

N.Y. Judiciary Law § 90(2).

[167]     New York State regulations state as follows:

> This court shall appoint a Departmental Disciplinary Committee for the Judicial Department, which shall be charged with the duty and empowered to investigate and prosecute matters involving alleged misconduct by attorneys who, and law firms that, are subject to this Part and to impose discipline to the extent permitted by section 603.9 of this Part.

N.Y. Comp. Codes R. & Regs., tit. 22, § 603.4(a).

grievance committees in other jurisdictions, "is a delegatee of the powers of the Appellate Division as an aid to that Court in carrying out its statutory functions."[168] The DDCs are thus arms of the State. All claims against them are dismissed because they are immune from suit under the Eleventh Amendment. Similarly, the OCA; SCJC; and New York State Grievance Committee, Ninth Judicial District are arms of the State of New York. All claims against these defendants are dismissed as well.

## b. Judicial and Quasi-Judicial Immunity

Plaintiffs have alleged that various judges of the New York court system have failed to uphold their judicial responsibilities in various ways, either by acting negligently or through malicious actions. Even if this were true, the alleged wrongdoings took place in the context of judicial proceedings where the courts had at least arguable jurisdiction over the relevant matters. Therefore, all suits against judges of the New York State court system for damages are dismissed.

Further, individuals who are not judges but "who perform functions closely associated with the judicial process" are protected by quasi-judicial

---

[168] *Rappoport v. Departmental Disciplinary Comm. for First Judicial Dep't*, No. 88 Civ. 5781, 1989 WL 146264, at \*1 (S.D.N.Y. Nov. 21, 1989).

45

immunity.[169] For these reasons, all claims for damages against Cahill, Cohen, Friedberg, Taub, other members of the DDC, and surrogates appointed by the court system are dismissed.

## B.     Failure to Investigate

Many of the defendants in these suits are accused of failing to investigate various allegations. However, as discussed above, there is no constitutional right to have the government investigate an allegation of wrongdoing.[170] Therefore, all constitutional claims for failure to investigate or pursue grievances are dismissed.

## C.     The *Rooker-Feldman* Doctrine

Several plaintiffs essentially ask the Court to review the decisions of the courts of the State of New York. The Court lacks jurisdiction to do so. Pursuant to the *Rooker-Feldman* doctrine, only the Supreme Court has appellate jurisdiction over state courts. If plaintiffs are correct that the state courts acted unconstitutionally, their proper recourse is to appeal to the higher courts of the state and then, if necessary, to the United States Supreme Court.

---

[169]     *See Oliva*, 839 F.2d at 39.

[170]     For this reason, these defendants are also entitled to qualified immunity.

46

## D.    Standing

Several of plaintiffs' claims relate to the alleged failure of various defendants to take appropriate steps in various attorney disciplinary procedures.  A non-party generally has no legally protected interest that is affected by such failure.  In the absence of such an interest, a plaintiff has no standing to assert a claim.[171]  Because they have no cognizable interest in having criminal or civil proceedings brought by the Government against the various defendants, plaintiffs cannot state a claim against government officials for failing to initiate those proceedings.

Capogrosso asserts that section 44 of the New York Judiciary Law is unconstitutional in that it "violates the Equal Protection and Due Process clauses of the U.S. Constitution both on its face and as applied to plaintiff."[172]  However, as discussed above, Capogrosso's constitutional rights have not been violated because she has no federal constitutional right to have her grievances investigated.  Because Capogrosso has suffered no injury from this alleged constitutional violation, she has no standing to assert that the statute is unconstitutional.  This claim is therefore dismissed.

---

[171]    *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[172]    *Capogrosso* Compl. ¶ 249.

## E.    Failure to Allege Wrongdoing

Rule 8(a) does not impose a substantial pleading burden on a plaintiff. The complaint need only state sufficient facts to put the defendant on notice of the conduct at issue. However, allegations of fraud must be pled pursuant to Rule 9(b), which imposes a heightened pleading standard. Plaintiff McCormick, who alleges that certain defendants have committed fraud, has failed to meet even the burden imposed by Rule 8(a). Her Complaint names as defendants Winthrop Rutherfurd, Jr. and David G. Keyko, who are alleged to be attorneys admitted to practice in New York.[173] However, it fails to provide specificity as to the actions they took to incur liability. The only relevant paragraph states that "Plaintiff obtained confirming evidence showing an organized and systematic fraud by the defendants involving more than $37 million and the falsification of official court records."[174] For this reason, McCormick has failed to state a claim against Rutherford and Keyko.

Similarly, Petrec-Tolino has failed to identify any action taken by Taub other than the administrative intake of his grievance petitions. He fails to allege that she took any action that infringed on his constitutional rights. His

---

[173]    *See McCormick* Compl. ¶ 11.

[174]    *Id.* ¶ 12.

48

claims against her are therefore dismissed. Similarly, Petrec-Tolino fails to allege

the existence of an enterprise other than a description, in the most nebulous and

conclusory terms, of a conspiracy among Eisenberg and the New York court

system. His RICO claims are therefore dismissed.

## F.    Supplemental Jurisdiction and Leave to Replead

When a plaintiff has not alleged diversity jurisdiction and her federal

claims fail as a matter of law, courts generally decline to exercise supplemental

jurisdiction over remaining state law claims.[175]  In these cases, all federal law

claims have been dismissed and there is no reason to depart from this general rule.

I therefore dismiss plaintiffs' state law claims. Plaintiffs' underlying disputes are

more appropriate for litigation in state court.

A pro se plaintiff should be permitted to amend her complaint prior to

its dismissal for failure to state a claim "unless the court can rule out any

---

[175]    *See* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to
exercise supplemental jurisdiction over a claim if, *inter alia*, "the district court has
dismissed all claims over which it has original jurisdiction"). *See also Martinez v.
Simonetti*, 202 F.3d 625, 636 (2d Cir. 2000) (directing dismissal of state law
claims when no federal claims remained); *Adams v. Intralinks, Inc.*, No. 03 Civ.
5384, 2004 WL 1627313, at *8 (S.D.N.Y. July 20, 2004) ("In the usual case in
which all federal law claims are eliminated before trial, the balance of factors to be
considered under the [supplemental] jurisdiction doctrine-judicial economy,
convenience, fairness, and comity-will point toward declining to exercise
jurisdiction over the remaining state law claims.") (quotation and citation omitted).

49

possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."[176] However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile."[177] Because plaintiffs have not suffered any wrongs that can be addressed in federal district court, leave to replead is denied.[178]

## V. CONCLUSION

For the reasons stated above, defendants' motions to dismiss are granted and certain claims and defendants are dismissed sua sponte.[179] The Clerk of the Court is directed to close these and related motions (in case no. 07 Civ. 11612, documents no. 41, 46, 49, 51, 65, and 66; and in case no. 08 Civ. 2391,

---

[176] *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999).

[177] *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

[178] Normally, McCormick would be permitted to amend her Complaint to expand her allegations against Rutherford and Keyko. However, her Complaint does not suggest that she could raise any cause of action against these defendants that would be cognizable in federal court.

[179] I note the Second Circuit's warning that "failure to afford an opportunity to oppose a contemplated sua sponte dismissal may be, 'by itself, grounds for reversal.'" *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) (quoting *Acosta v. Artuz*, 221 F.3d 117, 124 (2d Cir. 2000)). However, the Circuit has also noted that it is not bad practice to do so where "'it is unmistakably clear that the court lacks jurisdiction, or that the complaint lacks merit or is otherwise defective . . .'" *Id.* (quoting *Mojias v. Johnson*, 351 F.3d 606, 610-11 (2d Cir. 2003)). For the reasons discussed above, these cases fall into that category.

50

document no. 19) and these cases.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           August 8, 2008

## - Appearances – *Esposito v. State of New York* -

### Plaintiff (Pro Se):

Luisa C. Esposito
571 Roy Street
West Hempstead, NY 11552

### For Defendant the City of New York:

Philip Sebastian Frank
Assistant Corporate Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-0893

### For Defendant Harvey Gladstein & Partners LLC:

Traycee Ellen Klein, Esq.
Eric Brian Topel, Esq.
Epstein, Becker & Green, P.C.
250 Park Avenue
New York, NY 10177
(212) 351-4812

### For Defendant the State of New York:

Monica Anne Connell
Assistant Attorney General
New York State Office of the Attorney
    General
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-8965

### For Defendant Allen H. Isaac:

Thomas Blase Coppola, Esq.
Gordon & Rees, LLP
89 Headquarters Plaza N., 12th Floor
Morristown, NJ 10004
(212) 825-6900

### For Defendant Brian J. Isaac:

Anthony Daniel Grande, Esq.
Morgan, Melhuish, Abrutyn
39 Broadway, 35th Floor
New York, NY 10006
(646) 388-6448

**Plaintiff (Pro Se):**

Kevin McKeown
P.O. Box 616
New York, NY 10156
(212) 591-1022

**For Defendant the State of New York:**

Anthony John Tomari
Assistant Attorney General
New York State Office of the Attorney General
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-8553

**For Defendants Joseph F. McQuade and McQuade & McQuade, Esqs.:**

Joseph F. McQuade, Esq.
McQuade & McQuade
104 E. 40th Street
New York, NY 10016
(212) 599-3644

## - Appearances – *Carvel v. State of New York* -

**Plaintiff (Pro Se):**

Pamela Carvel
28 Old Brompton Road, Suite 158
London, SW7 3SS
England

## - Appearances – *McCormick v. State of New York* -

**Plaintiff (Pro Se):**

Suzanne McCormick
P.O. Box 102
Hastings on Hudson, NY 10706
(914) 693-6687

## - Appearances – *Capogrosso v. The New York State Commission on Judicial Conduct* -

**Plaintiff (Pro Se):**

Eleanor Capogrosso
122 E. 42nd Street, Suite 1616
New York, NY 10168
(212) 509 7700